## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KUNTA GABLE and SIDNEY HILL,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF NEW ORLEANS; LEN DAVIS; SAMMIE WILLIAMS; WAYNE TAMBORELLA; DWIGHT DEAL; ANTHONY SMALL; ROSS J.J. MOCKLIN; KENNETH HARRIS; DAVID BENELLI; MITCHELL DUSSETT; UNKOWN INSURANCE COMPANIES; and JASON ROGER WILLIAMS, in his official capacity as Orleans Parish District Attorney and as the successor in office and liability to former District Attorney Harry F. Connick, Sr.,<br><br>Defendants. | Case No. _____<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Kunta Gable and Sidney Hill, by and through their counsel, John Adcock Law LLC and Kaplan & Grady LLC, hereby complain of City of New Orleans, Len Davis, Sammie Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris, David Benelli, Mitchell Dussett, Unknown Insurance Companies, and Orleans Parish District Attorney Jason Roger Williams, in his official capacity as head of the Orleans Parish District Attorney's Office, and state as follows:

## PREFACE

This case is a powerful illustration of the terrible injustices that can happen when a city and its mayors, police chiefs, and supervisors oversee, condone, ratify, and defend the utter collapse of a police department.

In August 1994, three young, innocent Black teenagers—Kunta Gable, Sidney Hill, and Bernell Juluke—were swept into a nightmare, framed for a crime they did not commit. They were railroaded by officers with the New Orleans Police Department ("NOPD"), who themselves committed rampant misconduct and crimes while violating the civil and constitutional rights of the citizens of New Orleans.[1]

From 1990 to 1994, the NOPD collapsed as an institution due to failed leadership and deliberate indifference to basic precepts of constitutional policing. NOPD officers were allowed to operate with impunity—free from oversight, supervision, discipline, training, and accountability. Even after two of the NOPD officers directly involved in framing these three teenagers—Len Davis and his partner Sammie Williams—were arrested for and convicted of federal criminal, civil rights, and drug conspiracy charges, the horrors of the teenagers' frame-up persisted under the direction of the Orleans Parish District Attorney's Office ("OPDA"). Led by District Attorney Harry Connick, the OPDA suppressed evidence and pursued the wrongful convictions of the three teenagers.

For nearly three harrowing decades, Gable, Hill, and Juluke were falsely incarcerated at Angola prison. All three insisted upon their innocence. Yet during that time, no efforts to review their convictions were undertaken by those in positions of authority and power, despite the involvement of Davis and Williams at crucial stages of their arrest and prosecution.

---

[1] Gable and Hill are Plaintiffs in this action. Juluke has filed a separate action arising out of the same wrongful arrest, conviction, and detention. *See Juluke v. Davis*, No. 2:23-cv-3111 (E.D. La.).

In 2022, the three now-middle-aged men finally walked out of the gates of Angola, exonerated from the false charges and convictions that transformed their lives forever. But although the three men now have their freedom, they do not have the almost thirty years of life they lost while behind bars. This lawsuit seeks to hold accountable the institutions and individuals whose acts led to this terrible miscarriage of justice, and the leaders who knew about the systemic corruption at the heart of the criminal justice system in the City of New Orleans and Orleans Parish.

## INTRODUCTION

1.      On August 22, 1994, Rondell Santinac was shot and killed near the Desire Housing Projects in New Orleans. Officers with the NOPD framed three innocent teenagers—Kunta Gable, Sidney Hill (also referred to in court documents as "Leroy Nelson"), and Bernell Juluke—for the murder.

2.      Moments after Santinac was killed, NOPD officers Len Davis and Sammie Williams arrived at the scene of the murder. Before units dispatched by 911 arrived, and without speaking to any eyewitness, Davis told police dispatchers that Juluke was the perpetrator. But Davis and Williams both knew that this report was false.

3.      Minutes later, using a claimed traffic violation as pretext, NOPD officers stopped Gable, Hill, and Juluke in a car, miles away from where the shooting had occurred. Gable, Hill, and Juluke did not match the description called in by Samuel Raiford, a claimed eyewitness to the crime. Officers found no trace of weapons in the car. Nor did they find any other evidence connecting Gable, Hill, and Juluke to the shooting. The officers arrested the teenagers anyway.

4.      Police pressured Raiford to name Gable, Hill, and Juluke as the assailants and to identify them in a sham, unconstitutional "line-up." Raiford complied. Based on this wholly

unreliable eyewitness identification, prosecutors charged Gable, Hill, and Juluke with murder. No meaningful additional investigation of the shooting was conducted.

5.     At trial, prosecutors did not present a shred of physical evidence tying Gable, Hill, and Juluke to the crime. Two eyewitnesses who saw the shooting testified that Gable, Hill, and Juluke were *not* the perpetrators. Seven alibi witnesses also testified that the three teenagers were *not* at the scene of the crime when Santinac was killed.

6.     Defendants failed to disclose evidence favorable to Plaintiffs regarding Raiford's inconsistent statements to investigators and the grand jury. Defendants also failed to disclose the fact that Raiford had perjured himself shortly before trial, after being charged with burglary. As a result of these and other constitutional violations, the jury wrongfully convicted three innocent teenagers—Gable, Hill, and Juluke—of second-degree murder. They were sentenced to the mandatory term of life without the possibility of parole.

7.     Plaintiffs' wrongful convictions were no isolated event. This tragedy flowed from a culture of corruption that had long plagued the NOPD. A 2011 report by the United States Department of Justice ("DOJ") found that NOPD had "long been a troubled agency" that, "[f]or too long, . . . had been largely indifferent to widespread violations of law and policy by its officers." The same deficiencies the DOJ identified—including unjustified stops and arrests, fabricated evidence, deficient training and supervision, inadequate and corrupted investigations of reported misconduct, and more—were pervasive within the NOPD in the 1990s, and caused Plaintiffs' wrongful detention, prosecution, and conviction.

8.     In fact, the state of the NOPD in the 1990s was even worse than in the period covered by the DOJ's report. For example, in December 1994, just months after Gable, Hill, and Juluke were arrested, an undercover federal law enforcement operation uncovered a sprawling

criminal enterprise in the heart of the NOPD. The enterprise was orchestrated by two NOPD officers central to obtaining Plaintiffs' wrongful convictions: Defendants Len Davis and Sammie Williams.

9.      In 2022, the egregious miscarriage of justice that led to Plaintiffs' wrongful convictions was finally acknowledged. Following an extensive review and re-investigation, the modern OPDA determined that significant exculpatory evidence had been kept from both the teenagers and the jury during the criminal trial, and that the convictions and continuing imprisonment of Gable, Hill, and Juluke violated the federal and state constitutions.

10.     The OPDA, Gable, Hill, and Juluke filed a joint motion to vacate the criminal convictions. At a hearing on the motion, an OPDA representative admitted that "at every stage, this City has failed the Santinac family and the families of Bernell Juluke, Kunta Gable and Leroy Nelson."

11.     Judge Tracey Flemings-Davillier agreed. As she told Gable, Hill, and Juluke, "[y]ou all deserve . . . the utmost apology for the fact that so many years of your lives were taken for granted and that your lives were taken from you in the manner in which it was done, that should not have happened." She added, "it's painful to look at the fact that it took 28 years for this to come to this point. But you all are the real heroes."

12.     On October 19, 2022, after spending nearly thirty years and their entire adult lives behind bars, Plaintiffs walked out of prison as free men. Although the vacatur of Plaintiffs' convictions is a long-overdue step towards justice, it does not begin to remedy the enormous harm caused by Defendants' misconduct.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331

and § 1343 because Plaintiffs seek redress for the violation of their federal constitutional rights.

14.     The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28

U.S.C. § 1367 because those claims and Plaintiffs' federal claims derive from a common nucleus

of operative facts.

15.     Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391 because

most Defendants reside and/or resided in this District at the time the events took place, and because

a substantial part of the events and omissions giving rise to the claims asserted in this Complaint

occurred in this District.

## PARTIES

16.     Plaintiff Kunta Gable is a citizen and resident of the State of Louisiana. He resides

in New Orleans. Gable was falsely arrested for the murder of Rondell Santinac in 1994 and

wrongfully convicted of that crime in 1996. In 2022, Gable's conviction was vacated, and he was

released from prison.

17.     Plaintiff Sidney Hill (also referred to as "Leroy Nelson" or "Leroy Sidney Nelson")

is a citizen and resident of the State of Louisiana. He resides in New Orleans. Hill was falsely

arrested for the murder of Rondell Santinac in 1994 and wrongfully convicted of that crime in

1996. In 2022, Hill's conviction was vacated, and he was released from prison.

18.     Defendant City of New Orleans is a political subdivision of the State of Louisiana

and a municipal corporation. At all relevant times, the City of New Orleans employed the

individual Defendants and was responsible for the policies, practices, patterns, and customs of the

New Orleans Police Department.

19.     Defendant Len Davis is a former NOPD officer. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. Davis is currently incarcerated on death row at the United States Prison in Terre Haute, Indiana, for murder and other crimes. On information and belief, Davis resided in the State of Louisiana at the time the relevant events occurred. Defendant Davis is sued in his individual capacity. At all times relevant to the events at issue in this case, Davis was acting under color of law and within the course and scope of his employment with the NOPD.

20.     Defendant Sammie Williams is a former NOPD officer. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Williams resides in the State of Texas, but resided in the State of Louisiana at the time the relevant events occurred. Defendant Williams is sued in his individual capacity. At all times relevant to the events at issue in this case, Williams was acting under color of law and within the course and scope of his employment with the NOPD.

21.     Defendant Wayne Tamborella is a former detective with the NOPD and was the lead investigator for the Santinac murder. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Tamborella resides in the State of Louisiana. Defendant Tamborella is sued in his individual capacity. At all times relevant to the events at issue in this case, Tamborella was acting under color of law and within the course and scope of his employment with the NOPD.

22.     Defendant Dwight Deal is a former detective with the NOPD. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Deal resided in the State of Louisiana at the time the relevant events occurred. Defendant Deal is

sued in his individual capacity. At all times relevant to the events at issue in this case, Deal was acting under color of law and within the course and scope of his employment with the NOPD.

23.     Defendant Anthony Small is a former detective with the NOPD. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Small resided in the State of Louisiana at the time the relevant events occurred. Defendant Small is sued in his individual capacity. At all times relevant to the events at issue in this case, Small was acting under color of law and within the course and scope of his employment with the NOPD.

24.     Defendant David Benelli is a former supervisor of Len Davis and Sammie Williams. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Benelli resides in the State of Louisiana. Defendant Benelli is sued in his individual capacity. At all times relevant to the events at issue in this case, Benelli was acting under color of law and within the course and scope of his employment with the NOPD.

25.     Defendant Mitchell Dussett is a former supervisor of Len Davis and Sammie Williams. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Dussett resides in the State of Louisiana. Defendant Dussett is sued in his individual capacity. At all times relevant to the events at issue in this case, Dussett was acting under color of law and within the course and scope of his employment with the NOPD.

26.     Defendant Ross J.J. Mocklin is a former detective with the NOPD. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Mocklin resides in the State of Louisiana. Defendant Mocklin is sued in his individual capacity. At all times relevant to the events at issue in this case, Mocklin was acting under color of law and within the course and scope of his employment with the NOPD.

27.     Defendant Kenneth Harris is a former detective with the NOPD. His misconduct resulted in Plaintiffs' wrongful arrest, conviction, and imprisonment. On information and belief, Harris resides in the State of Louisiana. Defendant Harris is sued in his individual capacity. At all times relevant to the events at issue in this case, Harris was acting under color of law and within the course and scope of his employment with the NOPD.

28.     Defendant Unknown Insurance Companies are those Insurance Companies that may have issued and currently have in effect one or more policies of insurance covering the City of New Orleans, the OPDA, and/or the named individual Defendants for the actions Plaintiffs complain of in this lawsuit.

29.     Defendant Jason Roger Williams is the current Orleans Parish District Attorney. He is being sued solely in his official capacity as the successor in office and liability to District Attorney Harry F. Connick, Sr., who served in that role during all times relevant to this Complaint, for the damages caused by the policies and practices of the OPDA while Connick was the District Attorney.

## ALLEGATIONS

### I.     The Murder of Rondell Santinac

30.     At approximately 9:20 pm on the night of August 22, 1994, Rondell Santinac was killed at Humanity Street and Desire Parkway in New Orleans, Louisiana, near the Desire Housing Projects. Santinac died from a gunshot wound to the head.

31.     Around 9:25 pm, an individual named Samuel Raiford (also known as "Danky") placed a call to 911. Raiford stated that Santinac had been shot while riding as a passenger in a car that Raiford was driving. Raiford also claimed to have seen a single black male perpetrator in

unknown color clothing travelling in a blue Chevrolet Beretta ("b/m wearing unk color clothing in a blu chevy beretta fled on Benefit twd interstate"). He provided no other details.

32.     Almost immediately after the shooting occurred, NOPD officers Len Davis and Sammie Williams arrived at Humanity Street and Desire Parkway. No other police officers were present. Neither was Raiford.

33.     Three minutes after arriving on the scene, Davis called police dispatch and stated that he had identified a suspect in the shooting: "perps Pernell Maze bunch of golds in his mouth." "Pernell Maze" is a misspelling of "Bernell Mays," a name that Davis associated with Bernell Juluke, who had an older half-brother named Warren Mays.

34.     Davis and Willliams decided to broadcast the name "Pernell Maze" to frame Juluke for the shooting. As discussed below, this was done as part of an illegal enterprise for which Davis himself would soon be indicted and convicted. Williams, Davis's patrol partner and co-conspirator, endorsed and participated in Davis's plan. The officers' decision to frame an innocent man was consistent with their modus operandi in covering up multiple other shootings around this time as part of their illegal enterprise.

35.     There was no legitimate basis to identify Juluke as a suspect in Santinac's murder. Neither Davis nor Williams had spoken to Raiford when Davis identified "Pernell Maze" as the likely perpetrator. Moreover, Raiford reported that he could not identify the perpetrator and said nothing about gold teeth in his 911 call. Indeed, Raiford could not identify Bernell Juluke at the time of trial (at which time Raiford had changed his story, claiming that there were three perpetrators in the car rather than one).

36.     Davis and Williams later authored an Incident Recall report pertaining to the shooting. The report did not mention an investigation that would have led Davis and Williams to

identify "Pernell Maze" as a suspect. Instead, the report stated that Davis and Williams held Raiford until homicide detectives arrived to interview him and listed the suspect in the murder of Rondell Santinac as "unknown."

## II.     Gable, Hill, and Juluke's False Arrests

37.     At approximately 9:30 pm—after Davis and Williams radioed the police dispatcher that "Pernell Maze" was the shooter and after Raiford indicated he could not provide a description of the shooter—Davis and Williams spoke to Raiford at the scene. Davis then radioed a description of a single perpetrator in a four-door blue Chevy Beretta ("B/M, Pernell Maze, mouthof golds in blu 4-dr chevy berretta" and "veh-lt-blue-in-clr-chevy berretta").

38.     After Davis broadcast this report, NOPD officer Tommie Felix pulled over a grey, two-door Chevrolet Beretta at the corner of North Prieur Street and Bienville Street, using a traffic violation as a pretext. The intersection where the seizure occurred was near the Iberville Housing Projects, approximately five miles from the site of the shooting. In the car were three teenagers: 17-year-old Kunta Gable, 17-year-old Sidney Hill, and 18-year-old Bernell Juluke (the driver). Gable, Hill, and Juluke did not try to flee when they were pulled over. They fully cooperated with the police.

39.     Around 9:45 pm, Felix broadcast a request to check the vehicle registration on the car Juluke was driving. After hearing this request, Davis radioed a new description: three perpetrators in a two-door vehicle. This was consistent with Davis and Williams's scheme to frame the three teenagers.

40.     Other officers joined Felix and conducted a search of the grey Chevrolet Beretta and its occupants. No weapons or drugs were found in the car. Nor did police find any other evidence connecting the three teenagers to the shooting. Gable, Hill, and Juluke did not match the

description of a lone perpetrator provided by Raiford. Also, the car they were driving was a different color, with different features than what both Raiford and Davis had initially reported. Nevertheless, the officers arrested the three teenagers without probable cause.

### III.   Raiford's Grossly Deficient Identification of Plaintiffs

41.     Following Gable, Hill, and Juluke's arrests, NOPD officers drove Raiford to police headquarters on Broad Street, supposedly to conduct an identification procedure. That procedure, however, proved so grossly deficient as to be an "identification" in name only.

42.     On information and belief, Williams, Davis, and homicide detective Wayne Tamborella informed Raiford that *he* was one of the suspects in the murder. This was done prior to the lineup to intimidate Raiford and coerce him to make a positive identification of the suspects that NOPD officers would soon present to him.

43.     After Raiford arrived at the station, Tamborella and homicide detectives Dwight Deal and Anthony Small, who oversaw the identification process, told Raiford that Gable, Hill, and Juluke had been arrested while driving together shortly after the crime and suggested that they were responsible for the shooting.

44.     Raiford was presented solely with Gable, Hill, and Juluke—in other words, the three individuals who Tamborella, Deal, and Small had just indicated were responsible for the crime—and asked to identify them. No other individuals were present to test whether Raiford actually could identify the three teenagers. And police did not meaningfully record how the identification procedure was conducted. On information and belief, this "identification" procedure was consistent with identification procedures in the NOPD at the time.

45.     Raiford proceeded to "identify" the three teenagers as the perpetrators of murder. Raiford said that Juluke was the driver of the vehicle. Raiford claimed that Gable and Hill both shot weapons from the car.

46.     Following this unconstitutionally suggestive "identification," detective Ross J.J. Mocklin interviewed Raiford and detective Kenneth Harris took a formal statement from Raiford.

47.     Despite knowing that Raiford was making false statements about having seen Gable, Hill, and Juluke that night, Mocklin and Harris used the interview and statement to justify the arrest and prosecution of the three teenagers.

48.     Gable, Hill, and Juluke were not informed that they had been arrested for killing Rondell Santinac until they were booked on murder charges.

49.     The NOPD did not conduct any meaningful investigation into the shooting after obtaining Raiford's coerced and knowingly false identification. Indeed, apart from a single search warrant to search for weapons at the home of an uninvolved person (Albertha Carter) that yielded no relevant information or evidence, the investigation stopped.

## IV.     Connick's Office and NOPD's Repeated Constitutional Violations

50.     On October 20, 1994, the OPDA, under the authority of then-district attorney Harry F. Connick Sr., indicted Plaintiffs and Juluke for the murder of Rondell Santinac.

51.     By 1994, a long line of case law—including seminal cases like *Napue v. Illinois* and *Brady v. Maryland*—required prosecutors to turn over material evidence, including exculpatory and impeachment evidence, to the defense. In violation of their constitutional rights, however, the NOPD and Connick's office repeatedly failed to provide key exculpatory evidence to the accused and their lawyers.

52.     Several categories of information available at the 1996 trial were withheld by the OPDA.

53.     First, Connick's office did not disclose Raiford's grand jury testimony from October 20, 1994. That testimony contained statements regarding where, and at what time, Raiford supposedly witnessed a fight between Bernell Juluke and another individual (Jacob Carter) on the day of the murder.

54.     The details about the fight between Juluke and Carter were very important at trial. The fight was a crucial part of the State's theory of the case, supplying a motivation for the shooting (Raiford and Santinac were driving a car associated with Carter). The fight also formed a basis for Gable, Hill, and Juluke's alibi. Numerous trial witnesses testified that Juluke and Carter had been fighting at the Iberville project, about five miles away from the Desire project and just a few blocks from where they were picked up by police around the time of the murder.

55.     At trial, Raiford contradicted this alibi by claiming that he saw Juluke and Carter fighting before 9:00 pm on the day of the murder. But in his undisclosed grand jury testimony, Raiford said he had not seen Carter at all on the day of the shooting. Instead, Raiford claimed that he had seen Juluke and Carter fighting the day before.

56.     Second, Connick's office did not disclose the handwritten notes of a prosecutor's interview with Raiford before October 18, 1994, or the transcribed interview of Raiford at the NOPD homicide bureau early in the morning of August 23, 1994.

57.     In these documents, as well as in the undisclosed grand jury transcript, Raiford made inconsistent statements about the color of the vehicle supposedly used in the crime. This was another key fact demonstrating the unreliability of Raiford's identification of the three teenagers.

58.     Third, Connick's office did not disclose the fact that the State's sole eyewitness, Raiford, had been charged with a burglary attempt and committed perjury in 1996 by lying about his illegal actions captured on video surveillance. This evidence could have served as important impeachment evidence—showing that Raiford was willing to lie to government officials even after promising to be truthful—but was never provided to Plaintiffs.

59.     Davis would later allege that Raiford had been involved in criminal enterprises, including the sale of drugs. But Davis hid this potential impeachment information from Plaintiffs and Juluke as well, even as Defendants continued to cause their prosecution to continue.

60.     Fourth, Connick's office did not produce police logs indicating that Davis and Williams placed in motion the events that led to the arrest of the three teenagers. Indeed, the jury was never told about Davis and Williams's primary role in the events leading to Plaintiffs' arrest— a stunning fact given what transpired shortly after August 1994.

## VI.     The Broader Systemic Failures at the NOPD and Connick's OPDA

### A.     The NOPD from 1990 to 1995

61.     As the OPDA acknowledged in its extensive re-investigation of this case in 2022, the NOPD of the 1990s was a "troubled and unruly police department" with "the highest rate of proven wrongful convictions and convictions caused by official misconduct in the country." Operation Shattered Shield—the investigation conducted by the FBI—found misconduct that "no doubt epitomized a completely broken police department." According to LSU criminologist Peter Scharf, "The Len Davis case needs to be understood among systemic corruption. This was an era— not an individual."

62.     Senior NOPD officials displayed a staggering level of indifference toward police misbehavior, creating an environment in which abuses, corruption, and outright criminality were

able to flourish. In 1994, the United States Attorney for the Eastern District of Louisiana said he "would describe corruption in the New Orleans Police Department to be pervasive, rampant and systemic." Following Davis's 1996 conviction for running a cocaine protection racket, that same U.S. Attorney told reporters, "[t]his case is going to epitomize the depth of corruption in the NOPD," and "if given more time, I think we could have found more officers who were ready, willing and able to engage in corrupt activities."

63.     Indeed, during this period, an astonishing ten percent of NOPD's officers were facing criminal charges. The NOPD led the nation in police brutality complaints and more than forty officers were arrested from 1991 to 1994 for crimes like murder, rape, bank robbery, and auto theft. In 1993, two NOPD officers were charged with the rape of a woman in their custody, and seventeen officers were either arrested or convicted for criminal activity. And in 1995, thirty NOPD officers were charged with felonies for crimes including rape, kidnapping, and extortion.

64.     On March 22, 1990, NOPD officers beat to death a man named Adolph Archie after it was alleged that he killed a police officer named Earl Hauck. After Archie was transported to the hospital from the scene, a mob of about 100 officers were waiting for them after hearing that the police officer had died. At the hospital, police hurled death threats at Archie. Police radio revealed officers yelling "kill the motherfucker," "hang that bitch by his balls," "somebody kill him," and "fuck him up," or words to that effect. After one officer said, over the radio, "that's going on tape you know," another responded, "fuck a tape."

65.     Despite hearing these threats and invitations to lawlessness, no supervisor interceded to ask the officers to calm down or denounce the violence they were advocating to their peers. In fact, Arnesta Taylor, the NOPD Superintendent at the time, said he would not have taken

steps to stop those comments because "it would have made it worse." Taylor's reasoning was that, "[i]f you tell a kid not to do something, he is going to try to get away with it."

66.     Rather than follow department policy and take him to another hospital nearby, officers decided to take him to the police precinct to which Hauck was assigned. While there, Archie was beaten, kicked, stomped, and abused. Archie suffered two skull fractures, fracture of the larynx, fractures of the cheekbones, teeth that were kicked in, with hemorrhages in the testicle, lower abdominal cavity, and muscles in the back and neck. By the time Archie was taken to the doctor, 45 minutes after his initial trip to the hospital, he was in an unconscious or semi-conscious state. His face was marked with bruises and contusions, and he was having trouble breathing. Archie died 12 hours later.

67.     Despite the coroner calling his death a "homicide by police intervention," no one was disciplined for Archie's death. No officer was arrested or charged criminally for any of their actions, nor was disciplinary action been taken against any officer for their actions regarding Archie's death. Superintendent Woodfork issued public statements endorsing the police handling of the Archie matter and oversaw the police investigation that cleared all officers involved. After Mr. Archie's death, no officer was ever punished, reprimanded, or suspended for a single day.

68.     The Archie incident, while particularly egregious, was just the tip of the iceberg during this period. In 1991, the International Association of Chiefs of Police ("IACP") published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations." The same report, which was distributed to all division commanders, concluded that the department's failure to keep training records "leaves the department dangerously defenseless against failure-to-train based allegations and lawsuits."

69.     The IACP also noted problems with the NOPD's lack of supervision and its derelict disciplinary process. With regard to supervision, it found that:

"Commanders and supervisors do not establish goals or objectives for their subordinates. Their superiors do not establish goals or objectives for them."

"A number of officers apparently last received management/command/supervisory experience four years ago."

"A serious flaw in command/supervision relationships is the absence of performance goals to guide, evaluate, and correct performance of subordinates and to form the basis for commonly understood superior/subordinate performance expectations."

70.     With regard to discipline, the IACP noted, "only one captain and one lieutenant have received formal Internal Affairs training. Remaining staff have not received formal training in the internal affairs division." Furthermore, the NOPD's classification system for complaint made it difficult to determine which complaints involve similar types of conduct, *i.e.*, "which complaints involve brutality, for example, as opposed to verbal intimidation."

71.     The IACP 1991 report stated, "Internal Affairs does not keep record of, or in any way account for, those complaints which they feel, after initial observation, merit no further attention. Since no record is made of these complaints, neither their volume nor nature is known, or whether they were, in fact, legitimately handled."

72.     The IACP report further reported that "[i]n addition to trends in number of complaints, the nature of complaints is difficult to assess. In absence of case-by-case analysis, it is not possible to segregate investigations into discrete categories such as 'excessive force' or 'rudeness.'"

73.     Worse still, the IACP report found that "the citizen complaint/internal affairs record is not exemplary. The 1991 trend in number of complaints is cause for concern. Absence of reliable management information frustrates definitive analysis. Length of investigations and subsequent

response to citizen complaints has been unacceptable. Most significant, the complaint / internal affairs process is passive and inefficiently directed toward early identification of officers and conditions that produce citizen complaints and induce employee misconduct. Passive complaint intake practices also flaw the process."

74.     As the IACP report noted, "[t]he absence of reliable citizen complaint and internal affairs information is a glaring departmental management failure. Not only does the present condition of information frustrate meaningful analysis, but it also inhibits opportunity to take proactive and preventative measures against officers and conditions that generate citizen and internal complaints."

75.     The IACP concluded, "[w]e are quite uncomfortable that the department does not have a formal 'early warning' system in place. Complaint and discipline information is not codified by officer. It is difficult therefore to identify how many and which of the 490 officers facing discipline in 1990 were repeat offenders. Pattern analysis to assess continued similar complaints against the same officers is not aggressively pursued."

76.     In 1993, the IACP released a follow-up report concluding that the NOPD had made no improvements in the intervening two years in the areas of training, record-keeping, or training. The report further concluded that the NOPD Criminal Investigation Bureau was "failing in almost every crime category." "While the entire department must share responsibility for this poor performance," the report stated, the Investigation Bureau "is simply not getting its portion of the job done . . . primitive case management practices, absence of performance goals, measurement accountability, flawed selection process, and a stunning lack of training inhibits investigative effectiveness."

77.     On March 10, 1993, then-recent events compelled a New Orleans city councilperson to request that the United States Attorney conduct a criminal investigation of the NOPD. The councilperson wrote, "I am afraid that the problems afflicting the department are so deeply seeded and widespread that only by combining the resources of your office with those of the department itself, can this task be accomplished."

78.     In May 1994, a new mayor took office in New Orleans named Marc Morial. In his memoir, *The Gumbo Collection*, Morial reflected on his thoughts when he took office, just three months before the Plaintiffs' arrest:

> [T]he city's out-of-control crime rate was compounded by what I believed was corruption in the police department on a scale unimaginable. New Orleans led the nation in the number of civil rights complaints against its police department. . .. The corruption problem was so massive that two New Orleans police officers, Len Davis and Antoinette Frank, are on death row today for committing murders of the citizens they were charged to protect. Len Davis ordered a hit on a woman named Kim Groves, who singled him out for being a brutal cop. She wasn't alone in recognizing Davis's reputation for brutality. By all accounts, he very much earned the nicknames "Robocop" and the "Desire terrorist." Davis was caught on an FBI wiretap as he ordered the hit on Groves; he was under FBI investigation at the time for serving as a lookout and guard in uniform for drug dealers who were trafficking in cocaine in southwest Louisiana.
>
> * * *
>
> Antoinette Frank was convicted of murdering her own partner, another New Orleans police officer, by one account after a dispute over a private duty detail at a Vietnamese restaurant. By another account, she committed a violent armed robbery at that restaurant that resulted not only in her partner's death but also in the killing of two members of the family who ran the establishment. Corruption extended even to the highest ranks for the department, with at least one NOPD deputy superintendent getting fired for close relationships with Mafia figures and lobbying the legislature on behalf of gambling interests in return for hundreds of thousands of dollars in fees.
>
> * * *
>
> When I was sworn in, New Orleans held that dubious distinction of employing a police force with the most active FBI corruption complaints and investigations in

the nation. That affected everything from the quality of education in the city to attracting new industry." *Id*., at 9.

Morial later announced that reforming the NOPD was "a battle for the soul of the City."

79.     The "Len Davis" that Morial referred to in his memoir was the same Len Davis who radioed the name "Pernell Maze" in August 1994 and caused the arrests, and ultimately the convictions, of Plaintiffs and Bernell Juluke. Davis did so as part of a widespread criminal enterprise that was uncovered in late 1994, just a few months after the teenagers' arrests.

80.     For years, including in 1993 and 1994, Davis and Williams pursued a criminal enterprise of taking money from drug dealers in return for protection. That protection included, among other things, telling drug dealers to inform Davis and Williams when they planned to commit murders. Upon learning of the target and estimated date, Davis and Williams would handle the initial investigation and point the investigating officers in a direction away from the perpetrators who Davis and Williams sought to protect.

81.     Davis and Williams created a coding early warning system when a drug dealer or his associated were going to murder someone: they should first call Davis so he could let them know whether the coast was clear of other police and it was safe to proceed. Davis and Williams also advised criminal associates when shift change occurred because that was the best time to commit crimes, as there were few to no officers on patrol. Davis even agreed to "clear off" and warn drug dealers if other police officers were nearby.

82.     Sometime between 1989 and 1991, Davis began protecting his cousins, Little June and Charles Butan, in their drug dealing activities. They paid Davis to accompany them when they transported drugs; when riding with them, Davis brought his police uniform, his guns, and police light "to keep them from getting caught" when transporting drugs. Davis explained to his then-police partner, Leon Duncan, that if the police were to come by when Davis was riding with his

cousins, Davis would "jump out, identify himself, show his badge and just drive off." He also helped a fellow officer "invest" money in Charles Butan's drug dealing.

83.     When the FBI set up a fake drug warehouse for which Davis and Williams served as guards and lookouts, it recorded their phone conversations for more than a year. During the year, Davis and Williams recruited at least nine officers and two civilians to work in what Davis believed was the drug business. Davis, Williams, and their NOPD confederates thought they were protecting a warehouse full of cocaine that would be shipped throughout the region. Their role was to make sure those selling and transporting the cocaine would not be caught by law enforcement.

84.     During the FBI's surveillance of Davis and Williams, the FBI never saw or heard a supervisor talking to, or in the presence of, Davis and Williams. Indeed, supervision was so lacking that officers like Davis and Williams were free to run a criminal enterprise right under the noses of NOPD superiors like Benelli and Dussett, who knew or should have known that Davis and Williams routinely committed felonies and covered up crimes while on duty, in uniform and in their NOPD-issued squad car.

85.     During this criminal enterprise, Davis had one of his criminal associates murder a civilian, Kim Groves, because he was told she had made a complaint against him involving Davis's treatment of two twins—Nathaniel and Nathan Norwood—in Groves's neighborhood. The day Davis learned of the complaint, he and Williams stopped at a stop light and saw Groves in a car next to theirs. Groves and Davis began pointing and mouthing words to each other. Davis got upset and told Williams, "I can get 'P' to come do that 'ho and we can handle the thirty." "P" referred to Paul Hardy. "Thirty" was the New Orleans police code for homicide.

86.     Davis talked to Paul Hardy a few hours later. Davis told him that "the bitch got out in the car with the twins… the n****** that I was telling you about," and that he was worried that

Groves and the twins might have been on their way to the NOPD Internal Affairs Division. Davis described Groves's physical appearance and clothing and exclaimed to Hardy, "You know what I wanna do!" Later in the day, Davis met Hardy, Damon Causey, and two of their associates at the Fifth District police station and took them inside to see a collection of murder-scene photographs that one of the sergeants kept for entertainment.

87.     Davis and Williams brought Hardy to the area where Davis and Williams had previously seen Groves. Hardy got out and walked around the neighborhood but did not find her. Later in the evening, Davis and Williams spotted Groves in her neighborhood. Davis dialed Hardy's beeper number, entered 911 to indicate the urgency of the situation, and said, "Come get this 'ho.'" When Hardy called back, Davis told him, "that whore's standin' out there right now" and described Groves's clothing, hairstyle, and location. Referring to the Norwood twins, Hardy asked whether the "home boys" were there as well, and Davis answered: "No, fuck them. If they ain't out there, get that whore."

88.     A few minutes later, Hardy and two associates drove to Groves's neighborhood. When they arrived, Hardy exited the car, walked up to Groves and shot her before returning to the car and yelling, "Hurry up, hurry up … I hit the bitch one time in the head. "

89.     Davis then called Williams and said "signal 30. N.A.T." Williams explained in his trial testimony that "30" was police code for murder and "NAT" signifies "necessary action taken." Davis then called the police station's dispatcher about a "thirty-four S" (a shooting) and was told that a "head shot" had occurred on Alabo Street. Davis then received a call from Hardy and advised Hardy that "a certain motherfucker" was being taken to the hospital. Davis paged Gary Washington, the officer at the scene, and then called Williams. Laughing, Davis reported that "they

were fucking code-nining this bitch, man," indicating that Groves had been rushed to the hospital with a police escort.

90.     Williams then went to Flynn's Den bar to join Davis, who was speaking with Washington on the police radio and Hardy on his cell phone. Davis asked Washington if the situation was "looking like a thirty," and Washington said it was. Turning off the radio, Davis shouted, "Yeah, yeah, yeah, rock-a-bye."

91.     In 1995, Mayor Morial and Police Superintendent Richard Pennington requested the FBI's cooperation to address the rampant corruption within the NOPD. And in April 1996, the United States Department of Justice opened an investigation into the NOPD for allegations relating to pervasive use of excessive force, and illegal searches and seizures.

92.     Also in 1995, the New Orleans Human Relations Committee conducted a study that included the views of the City's Chief Administrative Officer, the City Attorney, and the Mayor's Criminal Justice Coordinator, among others. The findings concluded that supervision of NOPD officers was a major problem: "District Commanders, the Department's front line of management, had no authority over, or even information about, details working in their district. This meant, for example, that a district commander could not meaningfully monitor, much less manage, actions of officers wearing NOPD uniforms and working in their district."

93.     The study further found that "[t]here were no supervisory training programs for sergeant[s] and above." Instead, training across the board was "generally non-existent or haphazard," with "virtually no on-the-job supervision of policemen on the beat."

94.     Finally, the problem of corruption was manifest. The report even noted that "[f]ederal and state law enforcement officials ceased joint investigations with the NOPD because many such joint operations became compromised." It concluded: "the pre-Pennington Police

Department was underpaid, underdisciplined, underqualified, undermanaged, undermotivated, and undertrained. Straightening out such a problem was described by Chief Giarrusso as a 'damn near insurmountable task.'"

95.     The NOPD's failures to address and remediate these structural failures allowed corruption and criminality like that of Davis and Williams to flourish. In his tenure as an NOPD officer, Davis himself was suspended six times, including for battery; crashed his police vehicle; received twenty civilian complaints about his conduct; and had numerous internal affairs investigations, including for assaulting civilians. Nevertheless, in 1993, Davis received the Medal of Merit—the NOPD's second-highest honor.

96.     This misconduct was known to senior officials within the NOPD, including final policymakers and other leadership that had both the ability and responsibility to intervene and put a stop to the terror that NOPD officers, including Defendants, were inflicting on the citizens of New Orleans. Instead, the NOPD leadership effectively turned a blind eye to the misconduct, allowing it to continue unchecked.

97.     Despite receiving suspensions for physically and verbally assaulting individuals and interfering with criminal investigations, Davis and Williams received no meaningful additional training or supervision and were not taken off uniform patrol or barred from felony or murder investigations.

98.     During this time, City officials and high-ranking officials and supervisors in the NOPD, including Defendants Dussett and Benelli, knew or should have known of the pervasive criminal wrongdoing among NOPD officers. Given the extent of Davis and Williams's activities in covering for drug dealers and pointing murder investigations away from the criminals they were protecting and towards innocent individuals like the Plaintiffs, it was impossible for supervisors

not to know of their wrongdoing and criminal acts. That this behavior was allowed to persist for so long is itself evidence of the City and NOPD's policy and custom of allowing criminal wrongdoing, drug-dealing, and corruption to run amok without any discipline, supervision, or corrective action.

### B.   The District Attorney's Office under the leadership of Harry Connick, Sr.

99.     Like their counterparts at the NOPD, the OPDA of the 1990s suffered from deep and longstanding structural failings. In 2014, District Attorney Leon Cannizzaro gave a speech in which he said, "in the decades preceding my administration, the District Attorney's office had been in a steady state of decline. Over the course of that time period [*i.e.*, from 1974 to 2003], bad policy decisions took root and became institutional."

100.    Under Harry Connick Sr., who served as the New Orleans District Attorney from 1974 to 2003, the OPDA was well known for flouting discovery rules and sending innocent people to prison.

101.    For example, the written policy for turning over *Brady* evidence at the time of Plaintiffs' arrest and trial constituted just one paragraph, which contained numerous misstatements of law. The policy inaccurately stated that *Brady* obligations are triggered by a judicial order in response to a defense request for the disclosure of *Brady* material—rather than the actual requirement that *Brady* material be disclosed without any defense request. The policy did not mention that a prosecutor must turn over impeachment evidence (including evidence that undermines the state's case or the credibility of a witness). The policy erroneously suggested that *Brady* disclosures occur in "most" (rather than all) cases. And the policy stated that a prosecutor need only disclose information in possession of the state, in direct conflict with a prosecutor's obligation to inspect the police files for *Brady* evidence.

102.     Despite these problems, there was no effort to revise this policy between 1987 and 2003, when Connick left office. It is no surprise then that Connick's office committed numerous *Brady* violations over the years, including during the time of the arrest, prosecution, and conviction of the Plaintiffs between 1994 and 1996.

103.     Between October 1992 and August 1997, for instance, there were 18 *Brady* violations involving Connick's office in cases that went to trial. Between May 1991 and October 1996, there were 13 reversals of convictions in Orleans Parish because of *Brady* violations. Those violations were similar to those in this case. They included not disclosing impeachment evidence of eyewitnesses as well as the failure to look for *Brady* evidence in police files. These violations do not account for the unknown number of as yet undiscovered *Brady* violations.

104.     The reversals during this period included the landmark case of *Kyles v. Whitley* in which the Supreme Court—less than a year before Plaintiffs' trial—excoriated Connick's office for withholding *Brady* evidence specifically. Under Connick, the OPDA had suppressed evidence that undermined the accounts of two eyewitnesses, had withheld evidence that the main police witness was not candid with authorities about his role in the crime, and had withheld other evidence that would give rise to questions about the good faith and thoroughness of the police investigation. In the five years after the Supreme Court's 1995 decision in *Kyles*, when the office should have been on heightened alert as to problems with its *Brady* practices, Connick's office committed reversible *Brady* error in at least 12 major trials.

105.     On top of the affirmative misstatements in the one-paragraph *Brady* policy, Connick's office did not provide a valid, written policy to prosecutors to guide their disclosure practices. It did not have a policy to discipline ADAs for choosing not to disclose *Brady* evidence, even when that choice resulted in wrongful convictions. It did not supervise prosecutors' handling

27

of *Brady* obligations. It did not require supervisors to review *Brady* compliance as part of trial preparation or prosecutors to report the *Brady* violations of other prosecutors.

106.    Even when Connick's office became aware of *Brady* violations, it had a policy or custom of not tracking those violations, preventing decision makers from detecting patterns (such as types of recurring *Brady* violations) and responding appropriately. The OPDA did compile a list of *Brady* violations originating in the office sometime in 1999, but even then Connick's office did not use that list to investigate why those violations occurred or what remedial action was needed to prevent similar violations from occurring in the future.

107.    In a telling contrast, Connick's office did track the "wins" and "losses" of its prosecutors and an acquittal did often compel a supervisor to speak to the ADA on the case. Under Connick, the OPDA was more concerned with winning than with respecting the constitutional rights of those it was charging.

108.    Connick's office also established and maintained discovery practices that made it more likely that favorable information in the possession of the police would not be disclosed to the defense. For instance, the office did not have a policy to ensure that prosecutors found out about *Brady* evidence that involved witnesses in other cases occurring simultaneous with a prosecution. There was no policy that mandated coordination among prosecutors to ensure prosecutors were aware of *Brady* materials in a related case file. Nor were prosecutors required to request *Brady* materials from the police or inspect police files for *Brady* material.

## VII.    Gable, Hill, And Juluke Are Convicted After a Tainted Trial and Fight for—and Finally Receive—Their Freedom

109.    At trial, the state relied heavily on Raiford's testimony and his supposed eyewitness identification. No other eyewitness testified for the state.

28

110.    Plaintiffs and Juluke presented seven different witnesses, including Jacob Carter (the individual with whom Juluke was arguing with at the time of Santinac's murder), explaining that the group was miles away from the Desire project when the shooting took place. But as described above, Connick's office used Raiford's testimony to undermine that alibi. Contrary to his undisclosed testimony to the grand jury, Raiford claimed that the fight between Juluke and Carter had taken place earlier the day of the shooting.

111.    On March 1, 1996, after a ten-hour deliberation, the jury convicted Gable, Hill, and Juluke of second-degree murder. The teenagers were later sentenced to life without parole.

112.    Throughout their nearly three decades in prison, Plaintiffs steadfastly maintained their innocence and pursued relief through appropriate channels. For most of the time Plaintiffs were incarcerated, however, criminal convictions that hinged on investigations in which Davis and Williams had played a crucial role went totally unreviewed by any governmental agency.

113.    Finally, in 2021, the OPDA, under new leadership, began to conduct case-by-case post-conviction reviews. It focused on convictions where an individual did not commit the crime, where the NOPD and Connick's office violated the law or their obligations, and where the conviction was a result of racially discriminatory policies or practices of law. All three of these factors played a role in Plaintiffs' wrongful convictions.

114.    After collecting and reviewing a vast array of records relating to Plaintiffs and the conduct of those at the NOPD (including Defendants), as well as the murder of Rondell Santinac and other potentially related crimes, and after re-interviewing several witnesses and law enforcement, the OPDA reached the "unequivocal[]" conclusion "that the verdicts against Mr. Juluke, Mr. Gable, and Mr. Nelson were secured by the State while the jury was unaware of significant evidence that undermined the State's case and exculpated the defendants."

115.    The OPDA further concluded that "any confidence the State had in the convictions of Bernell Juluke, Kunta Gable, and Leroy Nelson has been entirely undermined" and that "these convictions were obtained in violation of the Constitution and may well have resulted in the conviction of three innocent teenagers."

116.    On October 19, 2022, Judge Tracey Flemings-Davillier held a post-conviction hearing regarding the joint motion to vacate.

117.    At that hearing, an attorney from OPDA told the court that, due to "an indifference to the rights of the defendants in this case and an indifference to understanding the truth of what happened to Mr. Santinac," there had not been "any second look at this case by any government agency at any level in 27 years." She stated that it was "long past time" for such a review.

118.    The OPDA attorney then explained the nature of the constitutional violations that had occurred in the wrongful arrest, prosecution, and conviction of Plaintiffs and Bernell Juluke. After the three teenagers were arrested in 1994:

> instead of any sort of trigger or red flag being raised by the fact that Len Davis and Sammie Williams were the first officers on the scene in this case and really directed the course of the investigation by the information that they had provided to other officers, the State of Louisiana simply fought to convict the three defendants, and it did so based on a single eyewitness who was Samuel Raiford. His testimony in all honesty was very hard to believe in several respects even at trial.
>
> * * *
>
> Our office – when I say our office, I mean the State, has evidence in its files that had it been disclosed to the jury it would have allowed them to make a fuller credibility determination of Mr. Raiford. We did not disclose inconsistent statements that he had made about key facts in this case before he took the stand.

119.    The attorney went on to explain that the State's constitutional violations had failed "the family of Rondell Santinac, because we got the wrong people"; "young Bernell Juluke and his family, young Kunta Gable and his family, and young Leroy Nelson, Sidney Hill, and his

family"; and "the people of New Orleans in failing to review the work of Len Davis and Sammie Wiliams, not just in this case, actually, but in other cases, too."

120.    Calling Gable, Hill, and Juluke the "real heroes," Judge Davillier vacated the three men's convictions. After 28 years of illegal and unjust incarceration, Plaintiffs were finally free.

## VIII.   Gable and Hill Have Suffered—and Continue to Suffer—Tremendously as a Result of their Ordeal

121.    The effects of the wrongful incarceration on Plaintiffs were profound. While Defendants went on about their lives, the lives of Plaintiffs were effectively frozen. Multiple members of Plaintiffs' families died while they were incarcerated, but because they were behind bars, Plaintiffs were kept from being able to spend time with these family members in their final days, grieve with the remaining family members, or attend their funerals. For example, Gable lost his grandmother, his grandfather, his mother, his father, his aunt, and his cousin while wrongfully incarcerated.

122.    Plaintiffs were similarly kept from making families of their own, unable to date and fall in love, have children, and make connections within their communities. When Plaintiffs walked out of prison, they walked out with far fewer connections to the outside world than when they walked in.

123.    Plaintiffs knew that they were innocent of the crime of which they had been accused. And they were forced to live with the extraordinary emotional trauma of having to serve decades of time in prison nonetheless. In addition, although Plaintiffs knew they were innocent, they were forced to endure the stress and stigma of being labeled murderers, as others they interacted with disbelieved their claims of innocence.

124.    Hill, the oldest of five siblings, grew accustomed to the company of his brothers, sisters, and cousins. After his arrest and throughout his incarceration, he felt guilt at his inability

to care for his younger siblings. A cousin died a year after he was arrested. His brother was killed by gunfire in 2015.

125.   Even the incarcerations they were forced to endure were particularly unjust. Because they had been sentenced to life without parole, Plaintiffs were not permitted to participate in rehabilitation programs during their incarceration, including educational activities, that were available to individuals with lesser sentences.

126.   It is difficult to describe the sum total of the physical and emotional injuries Plaintiffs suffered as a direct result of Defendants' illegal conduct. They include, among other things, Plaintiffs' physical injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, family relations, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, reading, television, movies, travel, enjoyment, and expression, for which they are entitled monetary relief.

<u>**COUNT I**</u>
**42 U.S.C. § 1983 – Violation of Due Process**
**(Against All Individual Defendants)**

127.   Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

128.   The individual Defendants, acting individually, jointly, and in conspiracy with one another (and individuals yet unknown), and under color of law and within the scope of their employment, deprived Plaintiffs of their constitutional rights to due process and to a fair trial.

129.    The individual Defendants accomplished this misconduct in the manner described above, including by unlawfully fabricating evidence that implicated Plaintiffs as the perpetrators of the murder of Rondell Santinac, concealing their misconduct, and deliberately withholding exculpatory and impeachment evidence from Plaintiffs, their counsel, and prosecutors.

130.    The individual Defendants intimidated, threatened, and coerced Raiford into identifying Plaintiffs, participated in an "identification" procedure that they knew to be unconstitutional and to result in a false identification, and took a knowingly false statement from Raiford implicating Plaintiffs in Santinac's murder. Davis and Williams further deliberately withheld and concealed Incident Recall reports from Plaintiffs.

131.    Plaintiffs are innocent of the murder of Rondell Santinac. Yet as a direct result of Defendants' misconduct, Plaintiffs were unlawfully arrested, detained, prosecuted, convicted, and incarcerated for nearly thirty years.

132.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

133.    As a direct and proximate result of the individual Defendants' actions, Plaintiffs were wrongly arrested, prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

134.    The individual Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the New Orleans Police Department. These policies and practices proximately caused Plaintiffs' injuries, as set forth above.

## COUNT II
### 42 U.S.C. § 1983 – Unlawful Seizure and Detention Without Probable Cause
#### (Against All Individual Defendants)

135.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

136.    The individual Defendants, despite knowing they lacked probable cause to initially detain and prosecute Plaintiffs for the murder of Rondell Santinac and continually detain and prosecute Plaintiffs, thereafter acted individually, jointly, and in conspiracy with one another (and individuals yet unknown), to cause Plaintiffs to be unlawfully detained and prosecuted for that crime in the manner described above. This conduct was undertaken under color of law and within the scope of their authority.

137.    The individual Defendants' conduct violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

138.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

139.    As a direct and proximate result of the individual Defendants' actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

140.    The individual Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the New Orleans Police Department. These policies and practices proximately caused Plaintiffs' injuries, as set forth above.

## COUNT III
### 42 U.S.C. § 1983 – Malicious Prosecution
### (Against All Individual Defendants)

141.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

142.    By engaging in the misconduct described above, the individual Defendants acted individually, jointly, and in conspiracy with one another, to directly cause the criminal prosecution against Plaintiffs for the murder of Rondell Santinac to be initiated and continued. Defendants' conduct was undertaken under color of law and within the scope of their authority.

143.    The criminal proceedings against Plaintiffs were initiated and continued without any probable cause, which the individual Defendants knew via their misconduct described above.

144.    In causing the criminal proceedings to be commenced and continued without probable cause, the individual Defendants acted maliciously and not to bring the individual or individuals guilty of the Santinac murder to justice.

145.    Plaintiffs are innocent of the murder of Rondell Santinac. Yet as a direct result of Defendants' misconduct, Plaintiffs were unlawfully arrested, detained, prosecuted, convicted, and incarcerated for nearly thirty years.

146.    In 2022, the criminal proceedings against Plaintiffs were finally and appropriately terminated in their favor.

147.    The individual Defendants' conduct violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

148.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

149.    As a direct and proximate result of the individual Defendants' actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

150.    The individual Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the New Orleans Police Department. These policies and practices proximately caused Plaintiffs' injuries, as set forth above.

## COUNT IV
### 42 U.S.C. § 1983 – Failure to Intervene Claim
### (Against All Individual Defendants)

151.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

152.     By their conduct and under color of law, during the constitutional violations described in this Complaint, Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though Defendants knew these violations were ongoing and had one or more reasonable opportunities to intervene.

153.     This misconduct was objectively unreasonable and was undertaken intentionally, with willful indifference to Plaintiffs' rights.

154.     As a direct and proximate result of the individual Defendants' actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

155.     The individual Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the New Orleans Police Department. These policies and practices proximately caused Plaintiffs' injuries, as set forth above.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy**
**(Against All Defendants)**

156.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

157.     The Defendants agreed among themselves and other individuals (including those yet unknown) to act in concert to deprive Plaintiffs of their constitutional rights, as described above. Defendants reached this agreement before Plaintiffs were arrested, and the agreement remained in place throughout their detention, prosecution, conviction, and imprisonment.

158.     The Defendants engaged in several overt acts in furtherance of the conspiracy, including but not limited to:

    a.  Calling over the radio that Juluke was involved in the murder of Rondell Santinac;

b.  Pressuring and threatening Raiford into identifying Plaintiffs;

c.  Conducting an unlawful "identification" of Plaintiffs;

d.  Fabricating police reports; and

e.  Failing to report and alert necessary authorities to Plaintiffs' innocence.

159.   This misconduct was objectively unreasonable and was undertaken intentionally, with willful indifference to Plaintiffs' rights.

160.   As direct and proximate result of the Defendants' conspiracy, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

161.   The individual Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the New Orleans Police Department. These policies and practices proximately caused Plaintiffs' injuries, as set forth above.

<u>**COUNT VI**</u>
**42 U.S.C. § 1983 – *Monell* Claim**
**(Against Defendant City of New Orleans)**

162.   Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

163.   The City of New Orleans was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New Orleans Police Department.

164.   Prior to the events giving rise to Plaintiffs' Complaint, the City, through the NOPD, had notice of policies, customs, and widespread practices of misconduct and corruption by NOPD employees. Despite knowledge of these problematic policies and practices, the City took no meaningful action to modify or stop them, thereby acting with deliberate indifference.

165.   These policies and widespread practices included, among other things:

a.  Utilizing improper and suggestive identification procedures;

b.  Failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court;

c.  Failing to investigate known exculpatory evidence;

d.  Intimidating and coercing witnesses to give untruthful statements;

e.  Failing to adhere to the standards of probable cause;

f.  Failing to comply with widely accepted standards documenting investigations.

166.    These widespread policies and practices were allowed to flourish because the City directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of NOPD employees, and/or failed to adequately punish, discipline, and deter prior instances of misconduct. In this way, the City violated Plaintiffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

167.    The City also acted to violate Plaintiffs' constitutional rights through the actions of its employees who were delegated final policymaking authority by the City.

168.    The City's policies, customs, and patterns and practices were a moving force behind the violation of Plaintiffs' rights.

169.    As a direct and proximate result of the City's actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

<u>**COUNT VII**</u>
**42 U.S.C. § 1983 – *Monell* Claim**
**(Against Defendant Williams in His Official Capacity)**

170.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

171.    The Orleans Parish District Attorney is responsible for the policies, practices, and customs of the office. Defendant Williams is the current Orleans Parish District Attorney and the

successor in office and liability to District Attorney Harry F. Connick, Sr., who served in that role during all times relevant to this Complaint.

172.    Prior to the events giving rise to Plaintiff's Complaint, Connick's office had notice of policies, customs, and widespread practices of misconduct by OPDA employees, including failing to document and disclose material, exculpatory and impeachment evidence to defense counsel and the court. Despite knowledge of these problematic policies and practices, Connick and others at Connick's office took no meaningful action to modify or stop them, thereby acting with deliberate indifference.

173.    These widespread policies and practices were allowed to flourish because Connick directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of OPDA employees, and/or failed to adequately punish, discipline, and deter prior instances of misconduct. In this way, Connick's office violated Plaintiffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

174.    Connick also acted to violate Plaintiffs' constitutional rights through the actions of OPDA employees who were delegated final policymaking authority by Connick.

175.    Connick's policies, customs, and patterns and practices were a moving force behind the violation of Plaintiffs' rights.

176.    As a direct and proximate result of Connick's actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

## COUNT VIII
### State Law Claim – Malicious Prosecution
### (Against All Individual Defendants)

177.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

178.    Defendants, acting individually, jointly, and in conspiracy with one another (including those yet unknown), caused Plaintiffs to be improperly subjected to criminal proceedings for which there was no probable cause.

179.    These criminal proceedings commenced and continued with malice and resulted in injury to Plaintiffs. All such proceedings were ultimately terminated in Plaintiffs' favor.

180.    Defendants accused Plaintiffs of murdering Rondell Santinac despite knowing they were innocent of the crime. Defendants fabricated evidence, manipulated and intimidated the only eyewitness, and withheld material exculpatory evidence. Defendants knowingly made false statements to prosecutors with the intent of exerting influence to commence and continue criminal proceedings against Plaintiff.

181.    Defendants engaged in the misconduct described in this count with malice, willfulness, and a reckless indifference to Plaintiffs' rights.

182.    As a direct and proximate result of the City's actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

## COUNT IX
### State Law Claim – False Arrest and Imprisonment
### (Against All Individual Defendants)

183.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

184.    Plaintiffs were unlawfully detained and arrested without probable cause.

185.    The individual Defendants initiated, caused, or participated in Plaintiffs' unlawful arrest and detention.

186.    As a direct and proximate result of the City's actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

<u>**COUNT X**</u>
**State Law Claim – Intentional Infliction of Emotional Distress**
**(Against All Individual Defendants)**

187.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

188.    The individual Defendants' conduct as described above that resulted in Plaintiffs' wrongful arrest and decades of wrongful incarceration was extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and Defendants acted as they did because they intended to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

189.    As a result of that extreme and outrageous conduct, Plaintiffs suffered severe emotional distress, as they were forced to spend nearly thirty years in prison for a murder they did not commit.

<u>**COUNT XI**</u>
**State Law Claim – Civil Conspiracy**
**(Against All Individual Defendants)**

190.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

191.    The Defendants agreed among themselves and other individuals (including those yet unknown) to act in concert to frame Plaintiffs for a crime they did not commit and conspired by concerted action to accomplish an unlawful purpose, or a lawful purpose by unlawful means. In addition, the co-conspirators agreed amongst themselves to protect each other from liability for depriving Plaintiffs of their rights.

192.     In furtherance of the conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

193.     The violations of Louisiana law described in this Complaint, including Defendants' malicious prosecution and false arrest of Plaintiffs and their intentional inflection of emotional distress, were accomplished by Defendants' conspiracy.

194.     As a direct and proximate result of Defendants' actions, Plaintiffs were wrongly prosecuted, detained, and incarcerated for nearly thirty years and suffered the other grievous injuries and damages set forth above.

**COUNT XII**
**State Law Claim – Respondeat Superior/Indemnification**
**(Against the City of New Orleans)**

195.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

196.     During all relevant times, the individual Defendants were employees of the City of New Orleans.

197.     As described above, which acting in the course and scope of their employment, Defendants committed tortious acts against Plaintiffs, causing them to suffer the above-described injuries.

198.     Defendant City of New Orleans is liable for all torts committed by its employees in the course and scope of their employment.

199.     In addition, the City of New Orleans is liable to Plaintiffs under any applicable contractual or statutory obligation that directs it to pay a tort judgment for compensatory damages for which its employees are liable arising from acts performed within the scope of their employment.

## COUNT XIII
### State Law Claim – Negligence/Gross Negligence
### (Against All Individual Defendants and the City of New Orleans)

200.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

201.    The acts of the Defendants were done with gross disregard for their natural consequences as to constitute negligence or gross negligence in violation of Louisiana law, and did directly and proximately cause the injuries, damages and wrongful incarceration of the Plaintiffs as described herein.

202.    The Defendant police officers were, at all times relevant to this Complaint, employees of the City of New Orleans and were acting within the course and scope of their employment and their acts and omissions are directly chargeable to the Defendant City of New Orleans under state law by the doctrine of *respondeat superior*.

## COUNT XIV
### State Law Claim – La. Rev. Stat. § 22:1269
### (Against Unknown Insurance Companies)

203.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth here.

204.    Defendant Unknown Insurance Companies may have issued and currently have in effect one or more policies of insurance covering the City of New Orleans, the OPDA, and/or the named individual Defendants for the actions Plaintiffs complain of in this lawsuit, obligating Defendant Unknown Insurance Companies, jointly and severally, to pay on behalf of the City or the individual Defendants any sum they may become obligated to pay Plaintiffs or to indemnify the City or the individual Defendants for any sum they may become obligated to pay Plaintiffs.

205.    As described above, the City of New Orleans and the individual Defendants are liable to Plaintiffs for all damages they sustained, and for their costs and reasonable attorneys' fees associated with bringing this suit. Defendant Unknown Insurance Companies are contractually

obligated to pay any judgment on behalf of the City or the individual Defendants or to indemnify the insureds for their payment of any judgment.

206.    Under Louisiana Revised Statute § 22:1269(B), Plaintiffs bring a direct action against Defendant Unknown Insurance Companies to recover any sums they are obligated to pay on behalf of their insureds or for which they are obligated to indemnify their insureds.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs Gable and Hill respectfully request judgment in their favor and against Defendants City of New Orleans, Len Davis, Sammie Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris, David Benelli, Mitchell Dussett, Unknown Insurance Companies, and Orleans Parish District Attorney Jason Roger Williams (in his official capacity), and to award compensatory and punitive damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: October 16, 2023                                  Respectfully submitted,

                                                         /s/ *John Adcock*
                                                         John N. Adcock (Bar No. 30372)
                                                         JOHN ADCOCK LAW LLC
                                                         3110 Canal Street
                                                         New Orleans, LA 70119
                                                         T. 504-233-3125
                                                         F. 504-308-1266
                                                         jnadcock@gmail.com

Sarah Grady*
Jed W. Glickstein[†]
David Schmutzer*
Nabihah Maqbool*
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
sarah@kaplangrady.com
* – admission *pro hac vice* pending
[†] – admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs*
*Kunta Gable and Sidney Hill*